**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 08, 2022

Ms. Jessica Vartanian Currie
Office of the U.S. Attorney
211 W. Fort Street
Suite 2001
Detroit, MI 48226

Mr. Richard M. Shulman
Law Office
24750 Lahser Road
Suite 105
Southfield, MI 48033

Re:  Case No. 21-1491, *USA v. Abiodun Fabode*
Originating Case No. : 2:18-cr-20351-3

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0447n.06

Case No. 21-1491

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Nov 08, 2022 |
| Plaintiff - Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| ABIODUN OLUFEMI FABODE, | ) | MICHIGAN |
|  | ) |  |
| Defendant - Appellant. | ) | OPINION |
|  | ) |  |

Before: SILER, McKEAGUE, and LARSEN, Circuit Judges.

SILER, Circuit Judge. Abiodun Olufemi Fabode was a licensed pharmacist and the co-owner of Friendz Pharmacy in Detroit, Michigan. In 2016, agents with the United States Drug Enforcement Administration noticed a series of "red flags" at Friendz Pharmacy. Those red flags included pattern prescribing (where the same doctor repeatedly prescribes the same type of opioid, the same strength opioid, and the same number of tablets to multiple patients); slotting (where doctors and pharmacists strategically space out prescriptions to avoid suspicion); remarkably high opioid prices; and an unusual number of patients paying for drugs with cash. These were all signs of a deep-seated and complicated drug-diversion conspiracy.

Here is how the scheme worked. A series of so-called "patient recruiters" found and paid sham patients to fraudulently seek out opioid prescriptions; some recruiters had as many as 80

Case No. 21-1491, *United States v. Fabode*

sham patients at a time. Those patients then obtained opioid prescriptions from complicit doctors, *i.e.*, doctors who were paid to write prescriptions for patients even though the patients had no identifiable medical need. Patient recruiters then met the patients, paid the patients for their prescriptions, and took those prescriptions to a complicit pharmacy, *e.g.*, Friendz Pharmacy. There, a complicit pharmacist filled the prescriptions, charged a premium—as much as a 400% markup on every prescription—and then handed the drugs directly to the patient recruiters. The patient recruiters then resold the drugs at an even higher price to street-level drug dealers. Everyone profited: the patient recruiters resold the opioids for street value, the patients earned about $100 for every prescription they procured, the doctors earned a substantial fee for every prescription they wrote, and the pharmacists earned a hefty profit on every prescription they sold.

Fabode's pharmacy sold a large quantity of exorbitantly priced opioids, Fabode personally filled many of the illicit prescriptions, and he often bypassed the sham patients and ensured that opioids were handed directly to the patient recruiters.

In 2018, federal prosecutors charged Fabode and five of his coconspirators with a series of federal drug-distribution charges. Every defendant except for Fabode pleaded guilty and cooperated with the government. Fabode proceeded to trial, and several of his codefendants testified against him. Their testimony linked Fabode to every facet of the conspiracy: the planning, the patient recruitment, the drug sales, and the attempted coverup. Fabode was convicted for violating 21 U.S.C. §§ 841(a)(1) & 846, which together prohibit any person without statutory authorization from knowingly or intentionally conspiring "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." The district court sentenced him to 96 months of imprisonment followed by three years of supervised release.

Case No. 21-1491, *United States v. Fabode*

Fabode now challenges his convictions and sentence. He takes issue with several statements made by the prosecutors at trial, one of the district court's evidentiary rulings, the district court's drug-quantity calculation, his sentence to a longer term of imprisonment than that received by his codefendants, and portions of the district court's jury instructions. We affirm.

I

Fabode believes prosecutorial misconduct tainted his trial. He supports his prosecutorial-misconduct claim with three arguments, none of which persuades us.

First, he says the prosecution impermissibly vouched for the credibility of its cooperating witnesses. "Improper vouching occurs when a jury could reasonably believe that a prosecutor was indicating a personal belief in a witness'[s] credibility." *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993). These comments often come in one of two forms. The first form is "blunt comments" about a cooperating witness's credibility, *United States v. Garcia*, 758 F.3d 714, 723 (6th Cir. 2014) (citation omitted), where a prosecutor expresses a personal opinion about the veracity of a witness's testimony. *See, e.g.*, *United States v. Acosta*, 924 F.3d 288, 299–300 (6th Cir. 2019). Second, improper vouching often takes place when a prosecutor suggests he or she "has special knowledge" or ability to evaluate the truthfulness of a witness's testimony. *Garcia*, 758 F.3d at 723 (citation omitted). Both forms of vouching are inappropriate because they "plac[e] the prestige of the office of the United States Attorney behind th[e] [cooperating] witness," *id.* at 723 (quoting *United States v. Trujillo*, 376 F.3d 593, 607–08 (6th Cir. 2004)), and "inevitably give jurors the [mistaken] impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the [witness] is not stretching the facts—something the prosecutor usually is quite unable to do," *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir.

- 3 -

Case No. 21-1491, *United States v. Fabode*

1994) (quoting *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1150 (2d Cir. 1978) (Friendly, J., concurring)).

Fabode points to one comment that, in his mind, amounted to improper credibility vouching. Fabode's attorney, Mr. Shulman, made the following remark in his closing statement:

> Now, all of these witnesses who were paraded before you by the government who were involved in a conspiracy, . . . all of them entered agreements with the government. They've all pled guilty to conspiracy, they've all given the government an agreement that said they would come in and testify, all in hopes that they would have their sentences reduced, and they're all facing significant time in prison pursuant to plea agreements, which are evidence, and you can look at those.

> For the most part, most of them are going to be serving about seven years in prison, and now they're seeking to reduce their sentences, and although no promises have been made to these people, they've all been told if you come in and testify and your testimony's helpful to us that we'll write a memorandum to the judge to have your sentence reduced.

> I want you to think about that. I want you to think about the credibility of the witnesses that you've heard in this case, all of them, and who has a reason to lie or not be totally candid?

The prosecutor responded:

> Mr. Shulman also talked about the cooperators in this case. He said that they're here, they're motivated, they want to tell the story that the government wants to hear so we can speak in their favor in reducing their sentences. All of them testified that recommendation does not come unless their testimony is truthful. And they were here to speak their truth, which is what they did. They've all accepted responsibility for their actions, and they were here to tell you about the truthful testimony they've given as to what their roles were in this conspiracy.

The prosecutor's response did not rise to improper vouching. He never implied he had some special ability to separate truth from untruth; he never implied, for example, that he would decide whether the witnesses testified truthfully enough to earn a reduced sentence. And even though the prosecutor's closing statement passingly characterized certain testimony as "truthful,"

Case No. 21-1491, *United States v. Fabode*

this remark was less flagrant than the cases that reversed a conviction for "blunt comments" about a cooperating witness's credibility. *Compare Acosta*, 924 F.3d at 299–300 (finding improper vouching where a prosecutor said a witness was "a fine young man" who "testified very well" and "remembered everything"), *with United States v. Reid*, 625 F.3d 977, 984–85 (6th Cir. 2010) (no improper vouching when a prosecutor passingly suggested a witness was a truthful person). Furthermore, when defense counsel attacks the credibility of the government's witnesses in his closing arguments, as he did here, the government may "respond by arguing that those witnesses should be believed." *United States v. Boyd*, 640 F.3d 657, 671 (6th Cir. 2011) (citing *Reid*, 625 F.3d at 985).

Fabode's second prosecutorial-misconduct argument fares no better. He says the government's closing argument "misstated the evidence" and "repeatedly referred to acts not in evidence." His brief cites two examples: (1) comments implying Fabode "trafficked in more than 200,000 doses of medication," and (2) comments suggesting Fabode "took in well over a million dollars from illicit [drug] sales." But even if these comments misstated the evidence, the district court cured any hypothetical error when it instructed the jury that "the lawyers' statements and arguments are not evidence." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001) (explaining how such an instruction "generally cure[s] any improprieties in a closing argument").

For his third and final prosecutorial-misconduct argument, Fabode accuses the government of interfering with his Sixth Amendment right to call a critical witness in his favor. This argument rests entirely on one witness: Olugbade Bolanle, Fabode's former business partner and the co-owner of Friendz Pharmacy. The government warned the district court that Bolanle could face potential criminal exposure if he testified. The district court agreed with the government and appointed counsel to advise Bolanle about "the possible implications of [his] testimony."

- 5 -

Case No. 21-1491, *United States v. Fabode*

When the defense subpoenaed Bolanle for trial, Bolanle's counsel appeared and advised the district court that his client was "inevitably going to take the Fifth Amendment" and that there was "no avenue of examination that . . . would be even remotely open for [his] client to answer questions." The district court quashed the defense's subpoena and excused Bolanle from trial. The district court explained that, with one minor exception, Bolanle's Fifth Amendment privilege would cover nearly every avenue of potential questioning.

While the Sixth Amendment affords criminal defendants the right to call favorable witnesses, *Washington v. Texas*, 388 U.S. 14, 19 (1967), this right "may, in appropriate cases, bow to accommodate other legitimate interests," *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). One of those competing "legitimate interests," we have explained, is a witness's "assertion of his Fifth Amendment privilege against self incrimination." *United States v. Gaitan-Acevedo*, 148 F.3d 577, 588 (6th Cir. 1998). It was reasonable for the district court to appoint counsel for Bolanle, hold a hearing to evaluate his potential criminal exposure, and make a specific finding that his privilege against self-incrimination would cover nearly every relevant issue to which he could testify at trial. Thus, the prosecution did not engage in misconduct, nor did it violate Fabode's constitutional rights simply by advising the district court that a potential witness faced criminal exposure if the defense compelled him to testify.

Every case relied on by Fabode is distinguishable. *Webb v. Texas*, for instance, held that a trial court deprived a criminal defendant of due process by directing a "lengthy," "intimidating," and "threatening" warning at the defendant's only witness. 409 U.S. 95, 97–98 (1972). But here the district court never offered such an "unnecessarily strong" admonishment to Bolanle. *Id.* at 98. The court simply recognized his Fifth Amendment right against self-incrimination and then

- 6 -

Case No. 21-1491, *United States v. Fabode*

appointed counsel to advise him about his constitutional rights. The other cases Fabode cites, *see e.g.*, *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976), are even farther from the mark.

In a last-ditch effort to muddy the waters, Fabode says the government should have granted use immunity to Bolanle because it would have removed any self-incrimination concerns, which, in turn, would have allowed Fabode to call Bolanle as a defense witness. Grants of immunity, however, are discretionary decisions left to the government. *United States v. Lenz*, 616 F.2d 960, 962 (6th Cir. 1980). And as we have previously explained, the Sixth Amendment right to call and compel favorable witnesses does not "require[] the Government to exercise its statutory use-immunity power affirmatively for a defendant's benefit." *Id.*

Even if the statements and actions flagged by Fabode had amounted to prosecutorial misconduct, none was flagrant enough to warrant a new trial. *See United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986) ("To warrant a new trial . . . prosecutorial misconduct 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.'" (quoting *United States v. Lichenstein*, 610 F.2d 1272, 1281 (5th Cir. 1980))). The alleged prosecutorial misconduct was isolated and infrequent, and, given the weight of testimonial and documentary evidence presented against Fabode, it is highly unlikely that any of the abovementioned behavior prejudiced him. *See Emuegbunam*, 268 F.3d at 404 (listing "the total strength of the evidence against the accused" as a relevant factor in any prosecutorial-misconduct inquiry).

II

Next, Fabode takes issue with the district court's decision to allow the government to question him at trial about a prior investigation into drug-distribution practices at Friendz Pharmacy. He believes the questioning ran afoul of Federal Rules of Evidence 404(b) (because it was prior "bad act" evidence") and 403 (because it was unduly prejudicial). We disagree. Even

- 7 -

Case No. 21-1491, *United States v. Fabode*

if the government's investigation-related questioning could be taken for the propensity inference prohibited by Rule 404(b), the questioning was still admissible and probative for at least two proper purposes: it rebutted Fabode's good-faith defense and impeached his credibility. Both of those admissible purposes were relevant and material to Fabode's trial, and the government's questions were sufficiently probative of those purposes to satisfy Rule 403's balancing scheme. Furthermore, the district court diminished the threat of any undue prejudice by prohibiting the government from discussing the facts underlying the 2011 investigation. The district court also issued two limiting instructions for the jury not to consider any prior-investigation evidence for the "propensity" purpose prohibited by Rule 404(b). Given the limitations imposed by the district court—how it restricted the scope of any investigation-related questioning and how it repeatedly instructed the jury to not consider the evidence for an inadmissible propensity inference—we find no abuse of discretion. *See United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989) ("In determining the admissibility of bad acts evidence under Rule 404(b), a trial judge is accorded 'broad discretion.'").

### III

Fabode also challenges the district court's drug-quantity calculation. The probation office recommended the district court hold Fabode liable for a converted drug weight of 49,225.31kg, which equates to the total number of Oxycodone 30mg and Oxymorphone 40mg pills sold at Friendz Pharmacy during the conspiratorial period (January 2015 to March 2018). This converted drug weight resulted in a base offense level of 36. USSG § 2D1.1(a)(5). After adding two points because Fabode abused a position of public or private trust (pharmacist), USSG § 3B1.3, four points because he "was an organizer or leader of a criminal activity that involved five or more participants," USSG § 3B1.1(a), and two points for obstruction of justice, USSG § 3C1.1, the

Case No. 21-1491, *United States v. Fabode*

report recommended a total offense level of 43. Fabode's total offense level of 43, paired with a criminal history category of two, yielded a guideline range of life imprisonment.

Luckily for Fabode, rather than holding him responsible for every Oxycodone 30mg and Oxymorphone 40mg tablet sold at Friendz Pharmacy during the conspiratorial period, the district court limited his liability to "prescriptions that he himself issued." This resulted in a base offense level of 34, which equates to a converted drug weight of 10,000–30,000kg. USSG § 2D1.1(c)(3). The district court also declined to apply the four-point leadership enhancement and the two-point obstruction-of-justice enhancement and reduced Fabode's criminal history category from a two to a one. All these decisions led to a significantly diminished guidelines range of 188–235 months. But the district court's leniency went even farther. The district court varied downward by roughly 50% because of its view that the guidelines range, though diminished, remained "much greater than necessary to achieve" 18 U.S.C. § 3553(a)'s objectives.

Despite the district court's leniency, Fabode says the court failed to adequately explain how it arrived at its drug-quantity calculation (10,000–30,000kg). And he believes the district court's alleged overestimation resulted in an erroneously high guidelines range which in turn led to a higher sentence.

We review a district court's drug-quantity calculation for clear error. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). And we find clear error only when there's no "competent evidence in the record" to support the district court's calculation. *United States v. Campbell*, 317 F.3d 597, 604 (6th Cir. 2003) (citing *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000)). So long as there is "some minimum indicium of reliability beyond mere allegation" to support the district court's calculation, we generally defer to the drug weight

- 9 -

Case No. 21-1491, *United States v. Fabode*

approximated by the finder of fact. *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995) (quoting *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989)).

Given this highly deferential standard of review, we find no reversible error here because there was more than "some minimum indicia of reliability" to support a converted drug weight of 10,000kg–30,000kg and a base offense level of 34. Friendz Pharmacy sold approximately 245,000 Oxycodone 30mg and Oxymorphone 40mg pills during the conspiratorial period, which translates to a converted drug weight of 49,225kg. Friendz Pharmacy had two licensed pharmacists. So if the district court split the converted weight—half for Fabode, half for the other pharmacist—it could have reasonably concluded that Fabode sold a converted drug weight of roughly 24,612.5kg. If roughly 40% of those sales were illicit, then the proper converted drug weight fell within what is required for a base offense level of 34. And testimony could easily lead a reasonable sentencing judge to believe that more than 40% of the Oxycodone and Oxymorphone pills sold by Fabode were sold illegally. One doctor, after all, testified to having approximately 200 patients regularly refill fraudulent opioid prescriptions, often at Friendz Pharmacy, and often by Fabode. We recognize these numbers are estimations, but "[d]istrict courts may approximate the quantity of drugs for sentencing purposes . . . as long as they err on the side of caution." *United States v. Elder*, 90 F.3d 1110, 1127 (6th Cir. 1996) (citation omitted).

Even if the district court erred in its drug-quantity calculation, and even if the error led to an incorrect guidelines range, this is one of the "unusual circumstances" where an incorrect guidelines calculation does not warrant a resentencing. *Cf. Molina-Martinez v. United States*, 578 U.S. 189, 201 (2016). The district court varied substantially from its guidelines calculation, and it implied the guidelines had little influence on its sentencing decision. So we are satisfied that even if the district court modestly overestimated the quantity of illicit drug sales attributable to Fabode,

- 10 -

Case No. 21-1491, *United States v. Fabode*

"a more lenient sentence would not be imposed" if we remanded the case for resentencing. *United States v. Alford*, 436 F.3d 677, 683 (6th Cir. 2006). Remand would therefore be an exercise in futility.

IV

Fabode also believes the district court impermissibly punished him for exercising his Sixth Amendment right to trial by jury. This is so, he argues, because his coconspirators, all of whom pleaded guilty, received substantially lower prison sentences than he received. But as we have previously explained, "[m]ere disparity in sentences is insufficient" to show a sentencing judge punished a defendant for exercising his right to trial by jury. *United States v. Frost*, 914 F.2d 756, 774 (6th Cir. 1990). Unlike Fabode, the other conspirators accepted responsibility for their actions. Each of them cooperated with the government and assisted the government's investigation. The district court was free to recognize their cooperation and reward them for their contrition. *United States v. Stewart*, 628 F.3d 246, 260 (6th Cir. 2010); USSG § 3E1.1 (allowing for a two-point offense-level reduction if a defendant "clearly demonstrates acceptance of responsibility for his offense").

Fabode also claims his sentence undermines § 3553(a)(6), which instructs district courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." We have explained that § 3553(a)(6) refers to "*national* disparities between defendants with similar criminal histories convicted of similar conduct—not disparities between codefendants." *United States v. Bass*, 17 F.4th 629, 636 (6th Cir. 2021) (quoting *United States v. Conaster*, 514 F.3d 508, 521 (6th Cir. 2008)).

Case No. 21-1491, *United States v. Fabode*

V

Finally, Fabode argues that the Supreme Court's recent decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022), requires us to reverse Fabode's convictions and order a new trial. However, it does not.

The statute underlying Fabode's convictions, 21 U.S.C. § 841(a), provides that it is unlawful for any person, "except as authorized," to "knowingly or intentionally" "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Doctors and pharmacists regularly dispense controlled substances, so the "except as authorized" clause is especially important when, like here, the government charged a medical professional with improperly distributing prescription medication. According to federal regulations, a prescription is authorized—and thus it lies outside § 841(a)'s prohibition—when it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). How to properly capture § 841(a)'s elements in a jury instruction—especially the "except as authorized" proviso and the guidance provided by § 1306.04(a)—is a difficult question we have addressed before. *See, e.g.*, *United States v. Godofsky*, 943 F.3d 1011 (6th Cir. 2019); *United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015).

In June 2022, more than two years after Fabode's trial and approximately three weeks before we held oral argument, the Supreme Court released its decision in *Ruan*, which sought to clarify the debate surrounding § 841(a). The Supreme Court held, for the first time, that § 841(a)'s "knowingly or intentionally" mens rea applies not only to the elements coming after the mens rea standard ("manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance") but also to the "except as authorized" clause at the beginning of the provision. *Id.* at 2375. In practice, this means the "except as authorized" clause works like

- 12 -

Case No. 21-1491, *United States v. Fabode*

an additional element: "[O]nce a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at 2376. Stated differently, if a defendant produces any evidence that he or she had statutory authorization to dispense or distribute the controlled substances underlying his charges, then the prosecution must show beyond a reasonable doubt "that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* at 2375. The Supreme Court reiterated, however, that circumstantial evidence and "objective criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice'" are often probative indicia of a defendant's subjective knowledge and intent. *Id.* at 2382.

Days after the Supreme Court released its decision in *Ruan,* we ordered the parties to submit supplemental briefing "discussing what impact, if any," the decision had on Fabode's appeal. Both parties submitted supplemental briefs, and we carefully reviewed their submissions.[1] For his part, Fabode asserts the jury instructions at his trial failed to capture § 841(a)'s mens rea requirement.

But we need not reach that question. This conclusion is motivated by the fact that Fabode never asked the district court to issue a *Ruan*-like instruction. He never asked the district court to instruct the jury that, to convict, it must find that he knowingly dispensed controlled substances without authorization or that he did so intentionally. And he never objected to the § 841(a) instruction given by the district court. Therefore, we review the correctness of the instruction, including its compliance with *Ruan*, for plain error. *Neder v. United States*, 527 U.S. 1, 9 (1999);

---

[1]   Fabode's attorney filed his brief one day late. He then moved this court to accept his untimely brief. (Doc. 50.) We **GRANT** that motion.

Case No. 21-1491, *United States v. Fabode*

*see also Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (applying plain error review when defendant has "an opportunity to object," fails to do so, and "later raises the forfeited claim on appeal").

Under plain error review, Fabode must show "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer*, 141 S. Ct. at 2096. Fabode cannot eclipse this high bar, as the evidence overwhelmingly demonstrated that he knew he was acting in an unauthorized manner. For instance, at trial, codefendant Niesheia Tibu testified that Fabode charged her more to fill prescriptions because she was a street dealer, and he knew she could get more money selling the prescribed substances on the street. Tibu also testified that after she was caught, she asked another pharmacist to warn Fabode not to fill any more of her prescriptions. Detective Chad Allan testified at trial that his investigation uncovered numerous ways that Fabode attempted to cover up his scheme using methods like data manipulation, pattern prescribing, and slotting. And codefendant Dr. Vasan Deshikachar testified at trial that it would be "obvious to other medical professionals" that Fabode's scheme was illegitimate.

Given the overwhelming evidence in this case, Fabode cannot show a reasonable probability that but for the district court's failure to issue a jury instruction consistent with *Ruan*'s mens rea holding, the outcome would have been different. Therefore, we find the Supreme Court's recent decision in *Ruan* does not require us to reverse Fabode's conviction and order a new trial.

AFFIRMED.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1491

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

ABIODUN OLUFEMI FABODE,

    Defendant - Appellant.

> **FILED**
> Nov 08, 2022
> DEBORAH S. HUNT, Clerk

Before: SILER, McKEAGUE, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the convictions and sentence imposed on Abiodun Fabode by the district court are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk